# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DAWN M. SPUHLER,

     *Plaintiff*,

*v.*                           CASE NO. 2:13-CV-12272

CAROLYN W. COLVIN          DISTRICT JUDGE STEPHEN J. MURPHY, III
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

This case was referred to this magistrate judge under 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, for the purpose of reviewing the Commissioner's

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Doc. 10 at 1; Doc. 12 at 1.)

Plaintiff Dawn M. Spuhler was forty-five years old at the time of the most recent administrative hearing. (Transcript, Doc. 7 at 39.) Plaintiff worked full-time in the United States Postal Service from 1985 until 2009.[2] (Tr. at 41-42, 160.) Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.*, on June 2, 2010, alleging that she became unable to work on August 10, 2009. (Tr. at 124.) The claim was denied at the initial administrative stage. (Tr. at 63.) In denying Plaintiff's claims, the Commissioner considered muscle/ligament, fascia, and affective disorders as possible bases for disability. (*Id.*) On May 4, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") John J. Rabaut, who considered the application for benefits de novo. (Tr. at 36-62.) In a decision dated October 26, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 21, 31.) Plaintiff requested a review of this decision on November 7, 2011. (Tr. at 16-17.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 8, 2013, when, after review of additional exhibits[3] (Tr. at 195-99, 366-88), the Appeals Council denied Plaintiff's request for review. (Tr.

---

[2] The earnings records also display unidentified earnings from 1981 through 1984. (Tr. at 134, 139.) She never provided additional information for these years. Also, the ALJ found that the three months she worked in 2010, after her alleged onset date, represented a failed work attempt. (Tr. at 23.)

[3] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

2

at 1-7.) On May 21, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105. The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)

(quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits

programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since December 17, 2009, the alleged onset date.[4] (Tr. at 23.) At step two, the ALJ found that Plaintiff's plantar fasciitis, obesity, anxiety, and depression were severe impairments under 20 C.F.R. § 404.1520. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 24-25.) At step four, the ALJ found that Plaintiff was

---

[4] The ALJ found that Plaintiff's work after the onset date was an unsuccessful work attempt. (Tr. at 23.) *See* 20 C.F.R. § 404.1574.

unable to perform any past relevant work. (Tr. at 29-30.) The ALJ also found that Plaintiff was forty-four years old on the alleged disability onset date, which put her in the "younger individual age 18-49" category under 20 C.F.R. § 404.1563. (Tr. at 30.) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 25, 30-31.) Therefore, the ALJ held that Plaintiff was not disabled. (Tr. at 21, 31.)

### E.   Administrative Record

#### 1.   Physical Impairments

##### a.   Podiatric Impairments

The medical evidence contained in the Administrative Record indicates that Plaintiff saw Daniel T. Zahari on March 3, 2009 for foot problems. (Tr. at 218.) She described an "aching" pain unrelieved by various treatments, including, steroid injections, orthotics, special shoes, physical therapy, shockwave therapy, and anti-inflammatory drugs. (*Id.*) Vicodin made standing at work bearable. (*Id.*) She did not appear to have edema, and her reflexes, muscle strength, and muscle tone were normal. (*Id.*) She limped to the right, perhaps caused in part by the "pain and swelling along the peroneal tendon" or the spurs in the heels of both feet revealed by x-rays. (*Id.*) Dr. Zahari diagnosed persistent "bursitis, and plantar facsitis right and left . . . . [a]chilles tend[i]nitis, poster heel spur and haglund's deformity right. . . . [and r]ight foot peroneal tend[in]itis." (*Id.*) He prescribed Voltaren Gel and Vicodin extra strength. (*Id.*)

During the next visit on May 27, 2009, she conveyed the same information and Dr. Zahari made the same observations. (Tr. at 219.) In fact, with a few exceptions, his treatment notes appear identical. (*Id.*) Her pain, she estimated, was at five out of ten on a visual analog ("VA") scale. (*Id.*) One block of walking was the most she could tolerate, Plaintiff stated. (*Id.*) On August 18, 2009,

the next consultation date, her subjective complaints varied. She stated that the condition was both "unchanged" and "worsening," and that her pain was at level four and five on the VA scale. (Tr. at 220.) While many of the remaining notes stayed the same, Dr. Zahari now found that her gait was stable and both ankles had normal ranges of motion without other problems. (*Id.*) The bursitis, heel spur, and plantar fascitis remained, and she also had capsulitis. (*Id.*) He reviewed treatment options and recommended icing, stretching, attending a pain clinic, and obtaining good shoes. (Tr. at 221) These "conservative care options," he informed her, "usually decrease[] symptoms 80-90%." (*Id.*)

Dr. Zahari noticed "mild edema" in her heels during the next two appointment, in August and September, but otherwise made the same observations and gave the same advice. (Tr. at 220-23.) By the following visit on November 10, 2009, Plaintiff had already gone to the pain clinic and "decided to have heel surgery." (Tr. at 224.) Plaintiff scheduled the surgery with Dr. Zahari for the next month. (*Id.*) In all of his examination notes, Dr. Zahari observed that Plaintiff paid "good attention to grooming and body habitus." (Tr. at 218, 219, 220, 222.)

Dr. Zahari performed the endoscopic plantar fasciotomy and trigger point injections on Plaintiff's right foot on December 17, 2009. (Tr. 216-17, 226-27, 328-29.) She returned home that evening with extra strength Vicodin and instructions to keep the foot elevated and use crutches for partial weight-bearing. (Tr. at 217.) She could resume "light to normal activity" the next day. (Tr. at 200.) The first post-operative visit was uneventful. (Tr. at 228.) Her pain, which she rated at level five, was "well-covered by . . . medication," and she continued to use the crutches. (*Id.*) Dr. Zahari put her lower leg in a cast, told her to "start weight[-]bearing to tolerance," and recommended elevating the leg for twenty minutes every two hours. (*Id.*) The next week, on

December 30, 2009, the cast was removed and Plaintiff received a cam walker. (Tr. at 229.) Her healing progressed "normally and uneventfully," with the pain level now at three or four. (*Id.*)

The pain had edged up to level five by the next appointment on January 13, 2010, but she also stated the condition was improving. (Tr. at 230.) Most of the treatment notes mirrored the pre-operation notes from 2009. Dr. Zahari added that Plaintiff's foot was healing normally and that the cam walker was unnecessary. (*Id.*) He extended the extra strength Vicodin prescription and also gave her Naprosyn. (Tr. at 230-31.) Two weeks later, on January 27, 2010, Plaintiff returned to Dr. Zahari for a "follow-up" appointment. (Tr. at 232.) The notes stated that Plaintiff's pain remained "unchanged," but also that the "pain has decreased to palpation to the heel right." (*Id.*)

The pain had increased by the next visit and Plaintiff now felt that the surgery was unsuccessful. (Tr. at 234.) At the visit, which occurred on February 24, 2010, Plaintiff admitted that she felt better until she went shopping, which caused the pain to increase. (*Id.*) Her gait stayed steady and her ankles' range of motion were normal. (*Id.*) And while the x-rays revealed the re-inflammation of the plantar fascia, Dr. Zahari concluded that the healing from the surgery was normal. (*Id.*) He prescribed extra strength Vicodin. (Tr. at 235.)

At some point not mentioned in his records, Dr. Zahari referred Plaintiff to Dr. Craig E. Whitmore to examine the pain developing in her left hip. (Tr. at 257.) While Plaintiff was using the cam walker, pain began randomly shooting through her hip. (*Id.*) She said the pain level usually hit eight on the VA scale, but went as high as ten. (Tr. at 262.) The Vicodin she took for her foot provided some relief to her hip. (Tr. at 257.)

Dr. Whitmore examined her on March 5, 2010. (Tr. at 257.) The initial paperwork asked Plaintiff if she experienced any of a list of problems, including one asking if she recently felt

10

"down/depressed/hopeless/little interest or pleasure in doing things." (Tr. at 263.) She did not circle the line, indicating that it was inapplicable. (*Id.*) He did not discern any "apparent distress," and found that she could rotate her hips within "functional limits," though this produced discomfort in the left hip. (Tr. at 257.) Stretching and strength tests were all normal and x-rays of her hips uncovered no abnormalities. (Tr. at 258, 259.) He decided to redirect her physical therapy sessions to focus on her hip pain and also switched her from Naprosyn to Cataflam. (Tr. at 258.) Plaintiff informed him of her workers' compensation case based on plantar fascia and asked that he add his diagnosis–that the hip pain resulted from the foot surgery–onto her claim. (*Id.*)

When she went back to Dr. Zahari on March 17, 2010, she reported that her foot condition was unchanged and that she had returned to work. (Tr. at 236.) Her prescription for Cataflam remained unfilled and, she claimed, physical therapy turned out to be unsuccessful. (*Id.*) The doctor's observations stayed static: she had normal gait, strength, range of motion, and no abnormalities. (*Id.*) The re-inflammation continued, but her post-surgery healing was otherwise normal. (*Id.*) The pain level inched up to six on the VA scale by the next appointment, on April 21, 2010, which she attributed to her work. (Tr. at 238.) The rest of the examination produced nothing new, though Dr. Zahari gave her a sample of Lyrica. (*Id.*)

The same day, April 21, Plaintiff had a physical therapy session at NovaCare–one of only two sessions documented in the Record.[5] (Tr. at 254-56.) Stiffness, loss of motion, and weakness, she claimed, restricted her activities. (Tr. at 254.) She then explained her situation at work, noting that the Post Office modified her job duties by allowing her to work four hours per day, five days

---

[5] The session notes list this visit as her first. (Tr. at 254.) Records from the next session, however, count twenty-eight prior visits. (Tr. at 250.) The discrepancy likely resulted from Dr. Whitmore's redirection of the sessions to focus on hip problems. (Tr. at 258.)

per week. (Tr. at 256.) Testing confirmed she had normal strength and range of motion. (Tr. at 254.) The physical therapist, Dr. Tulika Bansal, made an optimistic prognosis of Plaintiff's recovery and laid out significant objectives for her to achieve over the next month. (Tr. at 254-55.) She also created a home exercise program and recommended Plaintiff attend three therapy sessions per week for approximately one month. (Tr. at 253.)

Notes from the next visit, two days later, make many of the same observations. (Tr. at 250-53.) Plaintiff also gauged her capabilities for the therapist: she used both rails when climbing stairs, and even then could only take twelve steps; she could drive thirty minutes without pain; standing up to walk caused immediate pain and limping; squatting remained impossible; she could stand for thirty minutes, but then the pain rose to level seven on the VA scale; and she could walk for fifteen minutes before experiencing level seven pain. (Tr. at 250.)

Dr. Whitmore examined Plaintiff again on May 21, 2010. (Tr. at 248.) The current physical therapy sessions improved her hip pain by ninety-five percent, she estimated. (*Id.*) Her pain was normally at level one on a VA scale, and she experienced no "bad days" over the prior week. (Tr. at 249.) The pain no longer interrupted her sleep and even during the day the "twinges of discomfort" came only with "certain maneuvers, mostly when she [was] on her feet." (*Id.*) Hip rotations were normal and produced slight discomfort, while her gluteus medius palpitated and she had mild tenderness in other areas. (*Id.*) Her feet continued to bother her and Dr. Whitmore advised continuing treatment with Dr. Zahari; but he saw no reason to keep seeing Plaintiff. (*Id.*)

Plaintiff returned to Dr. Whitmore on August 13, 2010 with renewed complaints of left hip pain. (Tr. at 333.) The pain occurred two or three times per day, especially when walking. (*Id.*) She estimated the pain at level four on the VA scale. (Tr. at 341.) Examination results, including

12

rotation and strength tests, were normal and Dr. Whitmore "could not reproduce the pains." (Tr. at 333.) He diagnosed sporadic left hip pain and weakness of the left gluteus medius, and ordered an MRI. (*Id.*) He also gave her a Flector patch for her hip and samples of Arthrotec, a pain medication. (*Id.*) The MRI results came back on August 19, 2010, and were "[u]nremarkable." (Tr. at 337.) The last record from Dr. Whitmore is a note informing him that Plaintiff called on January 28, 2011 seeking paperwork for her workers' compensation case. (Tr. at 336.)

Plaintiff also continued treatment with Dr. Zahari through the end 2010 and the start of 2011. (Tr. at 308-25.) On May 5, 2010, Plaintiff rated her pain at level seven on the VA scale, describing it as "throbbing, aching[,] and burning." (Tr. at 322.) She attributed the retrogression to her return to work. (*Id.*) Dr. Zahari told Plaintiff to seek approval for orthotics and platelet-rich plasma injections before the next appointment. (*Id.*) The next session was similar, except Dr. Zahari observed Plaintiff's depression and wrote, "[t]he patient is unable to work due to depression and chronic heel pain." (Tr. at 321.)

Plaintiff received orthotics during the following visit on July 30, 2010, (Tr. at 319), and these were rechecked on August 11, 2010, (Tr. at 317), but otherwise her condition remained unchanged. (Tr. at 319.) Dr. Zahari extended the Vicodin prescription on August 25, (Tr. at 315), and again on October 5,  (Tr. at 313), November 30, (Tr. at 311), and January 25, 2011. (Tr. at 309.) The reports did not change through this period. (Tr. at 309-15.) Dr. Zahari obtained an EMG study of Plaintiff's legs, showing a potential abnormality in the right abductor muscle, but no other issues. (Tr. at 334.)

### b.      Mental Impairments

Plaintiff began counseling with Dr. Junaid Muhammad Ghadai for anxiety and sleep problems on September 21, 2006. (Tr. at 303, 305.) She believed her job caused these issues; in particular, her new supervisor, she claimed, yelled and had periodic outbursts. (Tr. at 303.) "If I could quit tomorrow I would," she informed the psychiatrist. (*Id.*) He noted that she dressed casually, spoke clearly and spontaneously, had goal-oriented thoughts and no suicidal ideation, had fair insights and memory, and was cooperative, calm, and alert. (*Id.*) She also appeared depressed. (*Id.*) The treatment notes through the start of 2011 reflect the same observations. (Tr. at 279-302.) He prescribed various medications during this period, including citalopram (Celexa), Requip, Panax, Effexor XR, Lexapro, Ambien, Restoril, Rozerem, and Seroquel. (Tr. at 194, 305.) He also filled out a Family Leave Act ("FMLA") form on January 22, 2008, stating that Plaintiff's depression would cause her to miss work intermittently for an undetermined period. (Tr. at 289.) A second FMLA form on June 10, 2008, explained that the need for intermittent work "varies from days [to] weeks [to] months [to] years." (Tr. at 286.)

Plaintiff's return to full-time work in March, 2010 lasted for one month, then her employer provided her a part-time position. (Tr. at 41-42.) By the next month, that position was no longer available and she began to perceive her supervisor had an animus against her. (Tr. at 372.) May 10 ended up being Plaintiff's last day with the Postal Service. (Tr. at 40-42, 192.) When she saw Dr. Ghadai on the following day, she expressed suicidal ideation for the first and only time. (Tr. at 269.) Concerned, he drafted a note excusing her from work until May 14, and he referred her to inpatient care at Oakwood Heritage Hospital, where she stayed for almost two weeks.[6] (*Id.*)

---

[6] The treatment records from the hospital, as well as the post-hearing records from Dr. Ghadai, are in the Record provided to the Court but were not available to the ALJ either at trial or before his

She continued counseling with Dr. Ghadai through 2011. (Tr. at 264-68, 344-65.) At times she appeared agitated and her insight limited, (Tr. at 267-68), at others her speech was brief and mood blunted, (Tr. at 264), and she remained depressed and anxious throughout. But the vast majority of the treatment notes show that she had good eye contact, was calm, spoke clearly, displayed "[g]oal-oriented" thinking, denied suicidal ideation, and had good memory. (Tr. 344-57.) In his narrative of her treatment history, Dr. Gahdai cited work as the primary source of her stress and stated that she has not been able to work after her hospital stay. (Tr. at 305.) He also wrote that Plaintiff thought the medications helped her depression and anxiety. (*Id.*) He gave her a present Global Assessment of Functioning ("GAF") score of thirty-five, and a score of forty-five for the prior year. (*Id.*)[7]

### c.    Administrative Hearing

At the hearing, Plaintiff testified that she left work in May, 2010, because "[t]hey could no longer accommodate my restrictions." (Tr. at 41.) When she returned to her job in March, she

---

decision. (Tr. at 366-88.) Courts review the record the ALJ saw. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148-49 (6th Cir. 1996). Neither party has questioned the validity of these reports and, in any case, they do not tip the scales on either side. The notes show that she participated willingly in the hospital treatment. (Tr. at 368.) The arrival interview confirmed her depressed state, but she "denied any active suicidality" even though she "had difficulty contracting for safety" with Dr. Ghadai. (Tr. at 372.) During her stay, she was "in no apparent distress" and came across as "pleasant." (Tr. at 370.) She improved "to the extent that she became relatively more engaging and was spontaneously verbal during individual and group session . . . ." (Tr. at 368.) At discharge, Plaintiff was "relatively engaging, more interactive . . . . [r]espond[ed] to questions with better affect and tone" and displayed coherent cognition. (*Id.*) Dr. Ashar H. Khan, who wrote the hospital reports, thought her prognosis was "[f]air" and recommended Plaintiff return to work after the end of the month. (Tr. at 369.) She left the hospital on May 21, 2010, after ten days of treatment. (Tr. at 368.)

[7] As the ALJ explained in his decision, a "GAF of 31 to 40 is indicative of some impairment in reality testing or communication OR major impairment in several areas; and a GAF [of] 41 to 50 is indicative of serious symptoms OR any serious impairment in social, occupation, or school functioning." (Tr. at 29.)

worked eight-hour days in a seated position; but this lasted only for one month. (Tr. at 41-42.) The Postal Service soon informed her that "they no longer can fill [her position] with a sit-down job. It was not available anymore." (Tr. at 42.) She then started a part-time position that enabled her to sit. (*Id.*) In May, that job also became unavailable. (Tr. at 43.) In the Function Report she completed before the hearing, Plaintiff stated she felt "they [were] discriminating because of my physical disability . . . which has caused my emotional disability." (Tr. at 174.) In particular, she contended that "they [were] paying co[-]workers overtime doing work I could do within my restrictions . . . ." (*Id.*)

"[A]fter all that had happened," she concluded, "I just went into depression mode." (Tr. at 43.) She entered the hospital program shortly after this, and "could have stayed longer . . . but they said that insurance would only pay for the two weeks." (Tr. at 44.) She admitted that medications reduced the depression, but asserted that they did not eliminate it. (Tr. at 49.) As she noted in her Function Report, "since May 12, 2010 I have not worked due to my emotional condition . . . ." (Tr. at 173.) Her physical pains also continued. (Tr. at 47-48.) The podiatric problems caused discomfort, around a six or seven pain level on the VA scale. (Tr. at 48.) Her hip pain returned and, as with the foot issues, did not seem to improve. (*Id.*)

She then discussed her daily activities. She slept in a bedroom on the second floor of her home. (Tr. at 44-45.) Personal care,[8] driving, shopping, playing games on the computer, and trying to help her son with homework were all well within her abilities. (Tr. at 50-51.) Elsewhere, she listed dusting, vacuuming, and washing dishes as the "light household chores" she completed each week. (Tr. at 176.)

––––––––––––––––––––

[8] Plaintiff's Function Report suggested one problem with dressing, bathing, shaving, and caring for her hair: "I stay in my pajamas 2-4 days a week. No energy, motivation [sic]." (Tr. at 175.)

She did not elaborate on her social life at the hearing, other than offering that she ate at restaurants. (Tr. at 52.) In pre-hearing paperwork, however, she mentioned visiting the zoo, amusement parks, the lake, and casinos. (Tr. at 178.) She participated in these activities up to five times per year, and asserted that she "[d]id them fine," although she sometimes needed a scooter. (*Id.*)

The ALJ then inquired into her functional capacities. (Tr. at 52.) Plaintiff testified she could stand for fifteen to twenty minutes, walk for fifteen minutes, and carry fifteen- to twenty-pound objects. (*Id.*) These estimates were slightly lower than those she had previously set out in her Function Report, where she said she could lift twenty-five pounds and stand or walk for thirty to sixty minutes. (Tr. at 179.) At the hearing, she reported having a "terrible" memory and feeling "nervous" around others. (Tr. at 53-54.) She considered her fits of nervousness to be "panic attacks," which she defined as "feel[ing] blah" and "just want[ing] to leave." (Tr. at 56.)

The ALJ asked the vocational expert ("VE") at the hearing to consider an individual with Plaintiff's background who:

> can perform work at the sedentary exertional; no operation of foot controls; no climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs; no constant balancing, stooping, crouching, kneeling, crawling; avoiding all exposure to unprotected heights. Work is going to be simple, routine, and repetitive in nature; performed in a work environment free of fast-paced production involving only simple work-related decisions with few, if any work place changes; no interaction with the general public; only occasional interaction with co-workers but no tandem tasks.

(Tr. at 59.) The VE responded that the hypothetical person could not perform Plaintiff's past work. (*Id.*) The VE described sedentary, unskilled jobs within the regional economy–Southeast Michigan–that met the ALJ's conditions: hand packager (3,250 locally, more than 200,000 nationally); visual inspector (1,500 locally, more than120,000 nationally); and security monitor

(1,500 locally, more than 120,000 nationally). (Tr. at 59-60.) Adding a sit-stand at will option did not change the VE's conclusions. (Tr. at 60.) If the hypothetical individual above lacked "sufficient concentration, persistence, or pace," she could not work full-time in a competitive environment. (Tr. at 61.)

### F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 25.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(b). The additional limiting conditions the ALJ placed on this description included that Plaintiff

> would require a sit/stand option, allowing [her] to sit or stand alternatively at will. The claimant could never operate foot controls. The claimant could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and frequently balance, stoop, crouch, kneel, and crawl. [She] should avoid all exposure to unprotected heights. [Her] work would be limited to simple, routine, and repetitive tasks; performed in a work environment free of fast paced production requirements; involving only simple, work related decisions; and with few, if any, work place changes. [She] could have no interaction with the public; only occasional interaction with coworkers, but no tandem tasks.

(Tr. at 25.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

2. **Substantial Evidence**

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff grounds her Motion on the deference ALJs owe treating sources. (Doc. 10 at 9-14.) The first leg of the attack is a straightforward treating source argument: the ALJ erred by rejecting Dr. Ghadai's assessment. (*Id.* at 9-12.) She next claims that the ALJ fashioned his residual functional capacity assessment ("RFC") without the benefit of any medical opinion on her limitations. (*Id.* at 13-14.) Put together, Plaintiff attempts what amounts to a pincer movement against the ALJ's decision. On one side, she strikes at the ALJ's rejection of Dr. Ghadai's opinion; on the other, she hammers away at the ALJ's limitation findings.

The argument collapses inward on close inspection. Plaintiff asserts that the ALJ "could . . . rely [only] upon Dr. Ghadai's opinions" unless he ordered more examinations, (*Id.* at 12), and later characterizes Dr. Ghadai's opinions as "*unrebutted* evidence" of her remaining capacities. (Doc. 12 at 3.) She then contradicts these statements, arguing, "[w]hether or not Dr. Ghadai's opinions are adopted, one fact remains–this record contains no assessment of [P]laintiff's RFC from any medical source, including Dr. Ghadai." (Doc. 10 at 12, 13.) In other words, unless the ALJ found enough evidence to support Plaintiff's disability, the Record did not contain sufficient evidence to make any decision at all. Therefore remand is required so that Plaintiff can pile on

more evidence to the roughly five years' worth of psychiatric treatment records already considered. Thus posed, the argument loses persuasive effect.

More importantly, the ALJ's findings betray no evidentiary or legal errors. Substantial evidence supports the ALJ's decision, and nothing required him to cast about for more medical source opinions on Plaintiff's limitations.

### a.    Treating Sources

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Sources often give evidence in the form of medical opinions. "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2. The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from non-treating acceptable

sources, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

However, a treating source opinion loses its controlling effect under certain circumstances. First, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh.'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting

*Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). At that point, the reviewing court should not subject the opinion to "greater scrutiny" than the non-treating sources, *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013), but rather treat it as any other medical opinion. 20 C.F.R. § 404.1527(c). Thus, the ALJ must employ the last five elements of the six-factor test described above to establish the weight the opinion deserves. *Id.* § 404.1527(c)(2). For example, sources can lose treating status if their opinions are internally inconsistent, contradicted by other evidence, cover an area the sources did not test, or lack supporting evidence. *See Robinson v. Barnhart*, 124 F. App'x 405, 412-13 (6th Cir. 2005) (holding that a treating opinion was not controlling because substantial evidence in the record contradicted it); *Love v. Comm'r of Soc. Sec.*, 605 F. Supp.2d 893, 897-98 (W.D. Mich. 2009) (noting that opinion was internally inconsistent and was not supported by objective evidence).

Additionally, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion [including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity,[9] and the application of vocational factors. *Id.* § 404.1527(d)(3). Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true

---

[9] The Commissioner's power to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (noting that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The ALJ must use the balancing test under 20 C.F.R. § 404.1527(c) to analyze those medical opinions not accorded controlling weight, and failure to do so can "constitute[] error" requiring remand. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)). But the "treating-source rule is not 'a procrustean bed, requiring an arbitrary conformity at all times.'" *Francis*, 414 F. App'x at 805 (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). An error is harmless if, "'(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527[c](2) . . . even though she has not complied with the terms of the regulation.'" *Cole*, 661 F.3d at 940 (quoting *Friend*, 375 F. App'x at 551).

23

The regulations mandate that the ALJ provide "good reasons" for the weight he assigns the treating source's opinion in his written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Determining whether a physician is a treating source is a fact-intensive inquiry. "Acceptable medical sources" qualify as treating sources only if they are "licensed physicians" or "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)-(2). *See also* SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). Additionally, to become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. § 404.1502. That is, treatments or evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *See, e.g.*, *Smith*, 482 F.3d at 876 (finding that two physicians who each treated claimant once were not treating sources).

24

In the Sixth Circuit, "more than one examination is required to attain treating-physician status." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir. 1989) (same). Moreover, "depending on the circumstances and the nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506-07. *See also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source . . . ."). Finally, a physician the claimant consults only to obtain a report for her disability claim is not a treating source. 20 C.F.R. § 404.1502.

### b.   Subjective Evidence

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of her subjective

####      c.      Analysis

####           I.      Dr. Ghadai's GAF Score

Plaintiff's first argument rests on a slender piece of evidence, a shaky assertion, and very little law. She pluck's Dr. Ghadai's GAF score of thirty-five from the Record, observes that it represents the closest thing in the reports to a medical opinion on her limitations, and concludes the ALJ could not reject it unless he ordered more examinations. (Doc. 10 at 9-12; Doc. 12 at 2-4.) The ALJ's analysis of Dr. Ghadai's records, Plaintiff continues, twisted their meaning. (Doc. 10

26

at 11-12.) She does not appear to take issue, at this point, with the ALJ's use of medical opinions on her physical ailments–her entire argument here deals with Dr. Ghadai.

Ultimately, the evidence cannot bear the weight of her conclusions. Focusing on the GAF score ignores substantial evidence supporting the ALJ, some of which consists of Plaintiff's own self-reported functional capacity assessments. The ALJ properly employed the regulatory factors to evaluate the GAF score–a type of evidence the case law consistently devalues.

The ALJ described Plaintiff's treatment with Dr. Ghadai in detail and used elements from 20 C.F.R. § 404.1527(c) to analyze the records. Dr. Ghadai was a treating source because he saw Plaintiff consistently over multiple years. (Tr. at 279-302.) To determine the probative value of Dr. Ghadai's opinions, particularly the GAF score, the ALJ first noted the length of the treating relationship, which had lasted a little over five years at the time of the decision. (Tr. at 28, 31.)

The next two factors, supportability and consistency, 20 C.F.R. § 404.1527(c), work against the Plaintiff. Tellingly, much of the evidence the ALJ used to evaluate the GAF score came from a reasonable reading of Dr. Ghadai's own records. Plaintiff contends that the ALJ mischaracterized this evidence, particularly the assertion that Dr. Ghadai's notes show Plaintiff had a "normal mental status." (Doc. 10 at 11-12; Tr. at 28.) But Plaintiff fails to ask or answer the critical question: "normal" compared to what? When juxtaposed with Plaintiff's entire psychiatric history and her work record, it is clear that Plaintiff was "normal" in the sense that she could function in the workplace.

The ALJ acknowledged the seriousness of the low GAF score, given on May 11, 2010, and of the slightly higher score for the preceding year. (Tr. at 28.) Yet, Plaintiff was able to work for most of that preceding year and, in fact, worked the day before Dr. Ghadai assessed the lower

score. (Tr. at 39.) In this case, unlike many others, Dr. Ghadai's consistency undercuts his supportability: he made the same observations about her mental state for the period she worked as he did for the period he claimed she could not work.

From the start of the treatment in 2006 until her hospitalization in 2010, Dr. Ghadai's opinions remained remarkably steady: though depressed and anxious, Plaintiff generally spoke clearly and spontaneously, dressed casually, had goal-oriented thoughts, lacked suicidal ideations, had fair insights and memory, and was cooperative, calm, and alert. (Tr. at 279-302.) The notes from May 11, 2010, and a few sessions after, thus represent a very unfortunate blip in her treatment. (Tr. at 264-69.) Even then, however, Dr. Ghadai's records do not reflect a drastic change. On May 11, Plaintiff was cooperative and goal-oriented with good eye contact and fair insight, though she was also labile, tearful, and agitated, and refused to guarantee she would not hurt herself. (Tr. at 269.) These acute conditions were thankfully short-lived. By the next visit two weeks later, she was able to contract for her safety, (Tr. at 268), and in the subsequent appointments she was no longer agitated, labile, or tearful. (Tr. at 264-67.)

In the remaining session notes, Plaintiff displayed many of the same characteristics as before May 11. She spoke clearly, was goal-oriented, had good memory, was alert, and made good eye contact. (Tr. 344-57.) The mental examinations, then, were as "normal" before the hospitalization as they were after. That is, Dr. Ghadai's assessments were consistent throughout both periods. Because these assessments did not preclude work in the first period, the ALJ reasonably concluded they would not in the second period either. (Tr. at 28-29.) Moreover, Plaintiff admitted that medications helped her depression even after May 11. (Tr. at 49.)

28

Even if the lone GAF score represented Dr. Ghadai's unflinching conclusion that Plaintiff could not work, it would still hold little weight. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). The Sixth Circuit noted that a GAF score may be useful, but "it is not essential to the RFC's accuracy" and failure to reference it "does not make the RFC inaccurate." *Id.* The court later added that a "GAF score is not particularly helpful by itself." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011). The ALJ in that case appropriately discounted the GAF because the clinical narratives showed the claimant to be alert, correctly oriented, and free from psychotic thoughts. *Id. See also Kornecky*, 167 F. App'x at 511 ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); *Adams v. Comm'r of Soc. Sec.*, No. 1:10-cv-503, 2011 WL 2650695, at *6 (W.D. Mich. May 27, 2011) (report and recommendation), *adopted by* 2011 WL 2650688 (W.D. Mich. July 6, 2011). The Commissioner also denies that GAFs correlate to severity measurements in the regulations, *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (citing *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005)), leading the Sixth Circuit to affirm a denial of benefits to an applicant with a GAF score of thirty-five. *Id.* (citing *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358 (6th Cir. 2001)). The similar GAF score here is neither controlling nor persuasive.

### ii.      Consultative Examinations on Claimant's Capacities

At this point in the analysis, Plaintiff's second argument becomes relevant. Once the ALJ dispensed with the GAF score, she contends, he removed the only evidentiary basis for his RFC and should have ordered a consultative examination. (Doc. 10 at 12.) This argument fails for several reasons.

29

Plaintiff is responsible for proving her disability. *Ferguson*, 628 F.3d at 275. She must offer evidence demonstrating "the existence and severity of limitations caused by her impairments . . . ." *Jones*, 336 F.3d at 474. *See also* 20 C.F.R. § 404.1512(c) ("You must provide evidence, without redaction, showing how your impairment(s) affects your functioning . . . ."). This includes proving her residual functional capacity. *Jones*, 336 F.3d at 474. Ultimately, "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).

The Commissioner will help "develop" a claimant's medical record by making "every reasonable effort to help [a claimant] get medical reports from [her] own medical sources . . . ." 20 C.F.R. § 404.1512(d). Reasonable efforts consist of two requests for documents from a medical source. *Id.* The regulations at the time of the hearing also required the ALJ to recontact medical sources if the evidence they provided was inadequate and the "report from your medical source contains a conflict or ambiguity that must be resolved . . . [or] the report does not contain all the necessary information . . . ."[10] 20 C.F.R. § 404.1512(e)(1) (2011).

The Commissioner can ask a claimant to attend a consultative examination, generally when the claimant's sources have not provided information or are "known to be unable to provide certain tests or procedures . . . ." 20 C.F.R. § 404.1512(e). The determination is "made on an individual case basis . . . ." 20 C.F.R. § 404.1519. The ALJ may order the examination if she finds the record lacks necessary information. *Id.* § 1519a. *See also Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Pittman v. Comm'r of Soc. Sec.*, No. 11-15115, 2012 WL 6831443, at

---

[10] This has since become discretionary. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23 2012) (codified at 20 C.F.R. § 404.1520b).

*5 (E.D. Mich. Dec. 14, 2012), *adopted by* 2013 WL 136238 (E.D. Mich. Jan. 10, 2013). The regulations "'do[] not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision.'" *Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). It follows that the ALJ does not need to request the examination if he believes the record contains sufficient evidence to make RFC determination. *Dickie v. Astrue*, No. 3:11-0585, 2012 WL 3285624, at *14 (M.D. Tenn. July 20, 2012), *adopted by* 2012 WL 3283458 (M.D. Tenn. Aug. 9, 2012). Courts apply the abuse-of-discretion standard to review this decision. *Hayes*, 357 F. App'x at 675.

Thus, while the ALJ must gather facts and put forward arguments for both sides, *Sims v. Apfel*, 530 U.S. 103, 111 (2000), the regulations do not transform her into the claimant's solicitous companion. Plaintiff's argument in this case would do just that. She argues that the ALJ needed more evidence to make his RFC findings; apparently through a consultative examination.[11] Plaintiff gave no indication to the ALJ that more evidence was needed before the hearing. She provided psychiatric reports from treatment spanning nearly five years–each detailing her memory, mood,

---

[11] It is not entirely clear what Plaintiff wants. Her Motion asks for summary judgment. (Doc. 10 at 2.) Her Brief requests the Court to reverse the Commissioner's decision and remand the "matter for consideration of the full record." (Doc. 10 at 14.) Her Response Brief wants the Court to reverse the decision or "[a]t the least, . . . remand[] [the case] for further analysis." (Doc. 12 at 5.) The logic of her argument revolves around the dearth of evidence that should have prevented the ALJ from fashioning any RFC. (Doc. 10 at 13-14.) Awarding benefits to Plaintiff would be improper following her own reasoning. Her brief to the Appeals Council suggested a consultative examination was required under 20 C.F.R. § 404.1503(e). (Tr. at 196-97.) That request misinterprets the regulation, which applies only to initial determinations finding mental impairments. 20 C.F.R. § 404.1503(e). A psychiatrist or psychologist must review the record before the Commissioner can make the initial decision–the regulation is unrelated to consultative examinations after that decision and before the hearing. *Mays v. Colvin*, No. 1:13-CV-191, 2013 WL 5797681, at *4 (N.D. Ohio Oct. 28, 2013). The signatures on the initial Disability Determination form and the explanation demonstrate that the review occurred here. (Tr. at 63, 71.) Finally, her brief to the Council also faulted the ALJ for not recontacting Dr. Ghadai. (*Id.* at 197-98.) That argument is not before the Court; and even if it were, my recommendation would not change because the ALJ had enough evidence before him to support his conclusions. Thus, it appears that Plaintiff requests a remand for the ALJ to develop the Record further through consultative examinations or recontacting Dr. Ghadai.

and mental clarity–and her counsel briefed the issues for the ALJ, never raising the possibility of another examination. (Tr. at 191-93, 279-302.) The brief to the ALJ described the treatment notes as "detailed records," and characterized the GAF score as at least a quasi-functional capacity assessment. (*Id.* at 192.) Counsel emphasized that "her condition has not significantly changed" since the GAF diagnosis, implying further diagnosis was unnecessary. (*Id.*)

It is not enough to rest on general assertions of the ALJ's discretion in this case, however, because Plaintiff points to case law demonstrating the importance of medical opinions that delineate functional capacities. (Doc. 10 at 8-10.) *See also McQuin v. Comm'r of Soc. Sec.*, No. 3:12-cv-1704, 2014 WL 1369674, at *12-14 (N.D. Ohio Mar. 31, 2014). The heightened importance of these opinions, she suggests, triggered the ALJ's duty to develop the Record.

Plaintiff misses the mark from the start by claiming that the RFC is a "'*medical assessment*'" under Social Security Ruling ("SSR") 83-10. (*Id.* at 8 (quoting SSR 83-10, 1983 WL 31251, at *7)). That was true twenty-three years ago; it is not, strictly speaking, true today. As the court in *Langley v. Astrue* ably explained, SSR 83-10 adopted the contemporaneous version of 20 C.F.R. § 404.1545 defining the RFC as a medical assessment. 777 F. Supp. 2d 1250, 1252 (N.D. Ala. 2011). In 1991, the Commissioner struck this line from that regulation, which was the only place it appeared. *Id.* Instead, 20 C.F.R. § 404.1527 now states that issues reserved to the Commissioner, such as the RFC, "are not medical opinions." Moreover, the court noted, SSRs are not binding and any deference courts give them disappears when they contradict a regulation. *Langley*, 777 F. Supp. 2d at 1253.

The *Langley* court concluded that the above analysis called into doubt an influential line of cases from the First Circuit that strongly suggested a medical opinion on functional capacity was

required. *Id.* at 1253-58. Those cases, however, ignored the changes in the regulations. *Id.* The Eleventh Circuit, in contrast, upheld a disability denial where the ALJ explicitly rejected the only opinion on capacities in the record. *Id.* at 1257-58. The court in *Langley* therefore found that the absence of an RFC from a medical source did not mandate reversal. *Id.* at 1261.

Cases in this Circuit highlight the significance of medical source capacity opinions, but by no means require them in the manner Plaintiff suggests. The regulations vest the ALJ with the power to determine the RFC–therefore, she "does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). The concern in cases emphasizing the need for medical source capacity opinions is that the ALJ will "'substitute his [or her] own medical judgment for that of the treating physician'" by attempting to interpret bare medical data. *Sparck v. Comm'r of Soc. Sec.*, No. 11-10521, 2012 WL 4009650, at *8 (E.D. Mich. Aug. 23, 2012) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Even the most forceful pronouncements in this vein, however, leave ALJs room to make "commonsense" judgments.[12] *See Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15,

---

[12] Many of these cases rely on *Deskin v. Commissioner of Social Security*, 605 F. Supp. 2d 908 (N.D. Ohio 2008). The court in that case stated:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . , to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.

*Id.* at 912. The court kept the "commonsense" exception. *Id.* Nonetheless, other opinions by the same court have questioned the viability of this case. In *Henderson v. Commissioner of Social Security*, the court found "that *Deskin* . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." No. 1:08 CV 2080, 2010 WL 750222, at *2 (E.D. Mich. Mar. 2, 2010). That same court subsequently portrayed *Henderson*, in turn, as much less sweeping in fact than its language suggests because substantial medical evidence supported the ALJ. *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *2-3 (N.D. Ohio Oct. 21, 2011). The series of cases nonetheless displays the ALJ's flexibility in using evidence to craft the RFC.

17 (1st Cir. 1996); *Mistoff v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 693, 703 (S.D. Ohio 2013) (adopting report and recommendation). Courts have affirmed denials without a capacity opinion in the record, or after the ALJ dispensed with such an opinion. *See Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923-24 (11th Cir. 2007) (holding that the ALJ could reject the only capacity opinion in the record and use the remaining treatment notes to form the RFC). In *Ford v. Commissioner of Social Security*, the court found that the ALJ properly determined the RFC after he rejected the only capacity opinion in the record, which came from the claimant's treating physician. 114 F. App'x 194, 195-98 (6th Cir. 2004). *See also Williams v. Astrue*, No. 1:11-cv-2569, 2012 WL 3586962, at *2-3, 6-7 (N.D. Ohio 2012) (upholding ALJ's decision where ALJ rejected the most recent–but still dated–medical opinion of claimant's functional abilities and the only other similar assessment came even earlier from a "one-time consultative examiner").

Similarly, in another case where the ALJ rejected all medical capacity opinion, she could nonetheless construct the RFC because the claimant did not identify any records containing complex medical data; the records were simply lay-person descriptions of symptoms. *Sneed v. Comm'r of Soc. Sec.*, No. 12-CV-15203-DT, 2014 WL 861525, at *21-22 (E.D. Mich. Mar. 5, 2014) (adopting report and recommendation). In many other cases, the "Sixth Circuit . . . has upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Henderson*, 2010 WL 750222, at *2 (citing *Poe*, 2009 WL 2514058, at *7); *Ford*, 114 F. App'x 194. *See also Langley*, 777 F. Supp. 2d at 1261 (holding that an RFC from a physician was not required). In a similar context, where the claimant argued the ALJ needed a medical expert to interpret the data, the Sixth Circuit observed that "a record is never really complete but 'taking "complete record" literally would be

a formula for paralysis . . . .'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009) (quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-58 (7th Cir. 1993)). Thus, a layperson, such as the ALJ, can understand some forms of evidence sufficiently to structure capacity limitations.

The ALJ here could translate the evidence into specific limitations without any expert guidance. The Record contained medical reports covering almost five years of treatment. (Tr. at 264-307, 344-65.) Dr. Ghadai did not use inscrutable medical jargon to describe his impressions. The only significant part of each report is the "Mental Status Examination," measuring Plaintiff's appearance, behavior, speech, mood, thoughts, suicidal ideas, orientation, memory, insight, and eye contact. (Tr. at 264-75, 278-85, 287-88, 290-303, 344-65.) Neither these terms nor the single-word descriptors used to measure them are incomprehensible to the layperson. Dr. Ghadai almost uniformly made the following descriptions: Plaintiff's behavior was cooperative and calm; her eye contact was good; her speech was clear; her thoughts were goal-oriented; her memory was "[g]rossly intact"; her insight was fair, which was one measure below good; and she was "[o]riented x 3," meaning she had no problem recognizing her present surroundings and other pertinent facts.[13] (Tr. 344-57.) She frequently spoke spontaneously, another measure of her mental and emotional ability. (Tr. at 265-67, 270-75, 278-85, 287-88, 290-99, 303, 351, 353-54, 356, 363, 365.) A reasonable reader could not miss the import of the measurements even if she stumbled over their precise meaning: each term laid on a spectrum of three or four choices that clearly ranged from healthy to unhealthy.

---

[13] The test reflects the standard practice in clinical assessment. David C. Martin, *The Mental Status Examination*, in *Clinical Methods* ch. 207 (3d ed. 1990). Even the technical explanations of the variables examined do not vary from common understanding. For example, "speech" relates to the patient's ability to respond to questions without "word-finding difficulties, or . . . rapid and pressurized speech . . . ." *Id.* at 925.

Other evidence was similarly straightforward. Dr. Ghadai's narrative assessment presented a comprehendible description of Plaintiff's health. (Tr. at 305-06.) He noted she felt helpless, frustrated, and anxious, among other things, and she had one serious episode of depression. (Tr. at 305.) She never displayed mania, hypomania, or psychosis, and only had suicidal thoughts at her visit during the episode in May, 2010. (*Id.*) Plaintiff's forms and testimony also provided evidence of capacities: she believed her medications helped decrease the symptoms, (*Id.*); she joined others in social activities, (Tr. at 24, 178); and she could handle her finances, (Tr. at 177).

The hearing decision carefully linked this evidence to appropriate limitations. The ALJ noted Plaintiff's assertions of cognitive deficits and interpersonal difficulties, yet found that she regularly spent time with her family, enjoyed public venues, shopped, and took care of her finances. (Tr. at  29.) These activities are not equivalent with full-time work, but when coupled with Dr. Ghadai's reports, a reasonably clear picture emerges of an individual who could interact appropriately with others and engage in numerous activities. It was no stretch for the ALJ to conclude that she could function socially in the workplace and complete ministerial tasks. He nonetheless incorporated contrary evidence into the RFC. Her possible positions would be sedentary, require limited contact with others, and routine assignments. (*Id.*) I suggest these findings should be upheld.

Plaintiff adds three lines in her motion noting that the Record also lacked capacity opinions on her physical ailments. (Doc. 10 at 13.) The argument is, at best, barely developed. And it would fail all the same if the Plaintiff expounded on it. First, Plaintiff provided her own capacity assessments in various forms. While she may not be a medical expert, it was reasonable for the ALJ to rely on them. The ALJ considered Plaintiff's estimation that "she could stand for 15-20

minutes, lift and carry 15-20 pounds, walk for 15 minutes, and sit for prolonged periods." (Tr. at 27.) These represented the lowest of her estimates; she gave her therapist a slightly better report. (Tr. at 250.) The ALJ's conclusion that these were "mild difficulties" is supported by sufficient evidence. (Tr. at 24.)

The remaining evidence of her foot problems gives weight to the ALJ's findings. The ALJ discussed the objective evidence from examinations showing a temporary limp but otherwise normal strength, range of motion, and radiographic results. (Tr. at 27.) Her hip pain improved almost completely upon initial treatment, and its return months later was not reflected in the MRI or medical examinations. (Tr. at 28.) Finally, the ALJ referenced the reason Plaintiff provided for leaving her job: her boss was "'playing games,'" (Tr. at 27), and told her the position she returned to "wasn't available anymore." (Tr. at 43.) This does not indicate her impairments prevented her from all work.

### 3.   Waiver

The recommendations above suffice to dispose of Plaintiff's case. However, I also note the colorable argument that Plaintiff waived her second contention by not raising it with the ALJ. The weight of authority suggests that her Motion should be denied on this ground as well.

The Supreme Court laid the groundwork for administrative waiver analysis–also called issue exhaustion–in *Sims*, 530 U.S. 103. The claimant there failed to make an argument to the Appeals Council that she subsequently raised in the district court. *Id.* at 105-06. The Court explicitly declined deciding whether waiver applied to claims the Plaintiff ignored at the hearing level. *Id.* at 107. The Court's analysis, however, would operate on those claims–the Court simply

did not have occasion to apply it. *See, e.g.*, *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435 (6th Cir. 2004) (using *Sims* to analyze issue exhaustion problems).

The issue exhaustion requirement can come from one of three places. *Id.* at 462-63 (describing the holding in *Sims*). Nothing from the first two sources–statutes and agency regulations–mandates finding waivers in Social Security cases. *Sims*, 530 U.S. at 107-08. The last category consists of judicially created exhaustion rules. *Id.* at 108-112. To apply, the administrative proceeding must resemble adversarial litigation, particularly the expectation that "the parties . . . [will] develop the issues." *Id.* at 110. A majority of the Court in *Sims* signed on to this framework. Only a plurality supported the operative holding that issue exhaustion did not apply because Appeals Council review was investigatory rather than adversarial. *Id.* at 110-12.

Reading the tea leaves scattered by the various opinions in *Sims* provides no firm indication of the Court's view on whether waiver can occur at the hearing level. The plurality opinion's expansive language considered the entire application process as inquisitorial: "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . and the Council's review is similarly broad." *Id.* at 110-11 (citations omitted). The regulations confirm that the review process is nonadversarial. 20 C.F.R. § 400.900. The four dissenters pointed in the opposite direction. The dissent noted that the "petitioner asked the reviewing court to consider arguments of the kind that clearly fall within the general rule, namely, whether an administrative law judge should have ordered a further medical examination or asked different questions of a vocational expert." *Id.* at 115 (Breyer, J., dissenting). The dissent predicted that the "plurality would not

forgive the requirement that a party ordinarily must raise all relevant issues before the ALJ." *Id.* at 117.[14]

Despite the lack of direction, many courts hold that the claimant waives any claims not raised before the ALJ. *See Howard v.Astrue*, 330 F. App'x 128, 130 (9th Cir. 2009); *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003); *Brady v. Barnhart*, 36 F. App'x 914, 914 (9th Cir. 2002); *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999); *Watson v. Astrue*, No. 08 Civ. 1523, 2010 WL 1645060, at *3-4 (S.D. N.Y. Apr. 22, 2010). The Sixth Circuit hinted in *Reynolds v. Commissioner of Social Security* that waiver occurs when a disability applicant fails to "put [her claim] at issue in the proceedings below" in front of the ALJ. 424 F. App'x 411, 416 (6th Cir. 2011). The court expressly found waiver in a case the next year where the plaintiff failed to raise her claim to either the ALJ or the Appeals Council. *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 809-10 (6th Cir. 2012). Other courts in the Circuit have thus required claimants to exhaust all issues at the hearing level. *Motin v. Comm'r of Soc. Sec.*, No. 09-CV-13354, 2010 WL 1754871, at *8-9 (E.D. Mich. Apr. 6, 2010), *adopted by* 2010 WL 1754821 (E.D. Mich. Apr. 30, 2010).

In the present case, Plaintiff waived her claim by failing to request at the hearing level a consultative examination or other evidence gathering procedure. The argument that "an administrative law judge should have ordered a further medical examination," the dissenters in *Sims* noted, falls "clearly . . . within the general rule" that claims not raised with the agency are

---

[14] Justice O'Connor's concurrence also focused narrowly on the regulations specific to Appeals Council review. *Id.* at 113-14 (O'Connor, J., concurring). Subsequent courts finding waiver at the hearing level have found the concurrence significant. *See, e.g.*, *Mills v. Apfel*, 244 F.3d 1, 4-5 (1st Cir. 2001) ("Justice O'Connor's 'swing vote' in *Sims* rested on the distinct and narrow ground that the regulations there in question might have misled applicants as to the duty to raise issues in the Appeals Council.").

waived. *Sims*, 530 U.S. at 115 (Breyer, J., dissenting). Plaintiff knew the extent of the evidence in the Record–she was the party who assembled it and boasted to the ALJ that the treatment notes were "detailed records." (Tr. at 192.)

Plaintiff had all of the evidence the day before the hearing that she had the day after the decision. She could have requested a consultative examination at any time. Her reluctance to do so no doubt came from a reasonable hesitancy to flag the lack of evidence in the Record for the ALJ; and also the probability that any new evidence would be unfavorable. That is, she took a calculated risk her proof was sufficient. The ALJ reasonably found it was not, and I suggest his findings should be affirmed.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v.*

*Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 17, 2014                     /S Patricia T. Morris
                                         Patricia T. Morris
                                         United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 17, 2014                     By   S/Alex Gallucci
                                         Law Clerk to Magistrate Judge Morris